## UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>DANNY FERGUSON,<br><br>　　　　　　　　Defendant. | 5:15-CR-50082-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is the Defendant's Motion to Suppress Evidence (Doc. 21).  A hearing was held on Monday, February 22, 2016.  Defendant was personally present and represented by his attorney of record, Terry Pechota.  The Government was represented by Megan Poppen.  Four witnesses testified at the hearing.  Ten exhibits were received into evidence.  Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. The court also requested, and the parties submitted, supplemental briefing on the limited issue of whether the Fifth Amendment right to counsel during an interrogation extends to a lay, non-licensed, tribal advocate.  Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the court respectfully makes the following findings of fact and conclusions of law.

## JURISDICTION

Defendant is charged in an Indictment with Arson, in violation of 18 U.S.C. §§ 81 and 1153.  The pending motion was referred to United States Magistrate Judge Daneta Wollmann pursuant to 28 U.S.C. § 636(b)(1)(B) and United States Chief Judge Jeffrey Viken's Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

During the night of April 6, 2015, Christy Garnette Pierce, was inside her trailer in rural Kyle, SD, when she heard her dog barking.  (Doc. 23 at p. 1). Ms. Pierce's daughter heard a car door shut and saw a light.  (Id.)  According to Federal Bureau of Investigation ("FBI") Special Agent Michelle Gruzs' testimony, Ms. Pierce also became aware of a smell, but did not investigate.  The morning of April 7, 2015, Ms. Pierce's son, Sam Rios, noticed signs of scorching on a chair, the ground, and some wood outside of the residence.  (Id.)  He discovered a "Juicy Juice" plastic bottle that smelled like gasoline.  (Id.)  Based on past incidents, Ms. Pierce assumed the scorching was related to the Ferguson family.  (Id.)

On April 8, 2015, at approximately 5:00 p.m., Ms. Pierce allegedly witnessed the defendant, Danny Ferguson, drive up to her trailer on a dirt bike while holding a grey blanket.  (Doc. 23 at p. 1).  Ms. Pierce and her son allegedly witnessed the defendant light the blanket on fire and stuff it under the skirting of the trailer.  (Id.)  The defendant then allegedly rode away on his dirt bike.  (Id.)

2

On April 29, 2015, Special Agents Michelle Gruzs and Mark Lucas went to Mr. Ferguson's residence to question him about the scorching at Ms. Pierce's residence. (Exhibit 6). The conversation was cordial. Mr. Ferguson commented that the "FBI kind of scares [him]." Agent Gruzs informed Mr. Ferguson that she and Agent Lucas wanted to speak with him, but he was not under arrest and could ask them to leave at any time. After some discussion surrounding a feud between the Ferguson family and Ms. Pierce's family, Agents Gruzs and Lucas made it clear that they suspected Mr. Ferguson of attempting to burn down Ms. Pierce's trailer. They told him that if he was not the one who did it, he should tell them who did try to burn down Ms. Pierce's trailer. Mr. Ferguson said he would be willing to take a polygraph examination. His agreement was made in response to a comment made by Agent Lucas about Mr. Ferguson's confidence that he was not the one who attempted arson. At some point during the interview, Mr. Ferguson expressed to the agents that they had crossed a line in their questioning and he asked them to leave. The agents left immediately.

Agent Gruzs contacted Mr. Ferguson's mother or father by phone several times to arrange the polygraph. Mr. Ferguson returned Agent Gruzs' calls and agreed to take a polygraph examination. The polygraph was set for May 15, 2015. On that day, at approximately 10:00 a.m., Mr. Ferguson arrived at the Justice Center in Pine Ridge South Dakota. The defendant rode with his wife. His tribal advocate, John Witt, met Mr. Ferguson and his wife at the headquarters.

The Justice Center is divided into a public space and a secured area which leads to the Bureau of Indian Affairs space.  To enter the secured area, one must approach the reception desk and be let in through locked doors by the receptionist.  To leave the secured area, one may merely walk back through the doors.  There are bathrooms in the public area.  It was unclear whether there were bathrooms in the secured area and whether those would have been accessible to Mr. Ferguson.

Mr. Ferguson, his wife, and Mr. Witt were asked to wait in the public area of the headquarters while Agent Gruzs and South Dakota Division of Criminal Investigation Agent Jeff Goble prepared the examination room located in the secured area.  It was estimated that this preparation took about 30-45 minutes.

Between 10:30 and 10:45 a.m., Agent Gruzs took Mr. Ferguson and Mr. Witt to meet Agent Goble.  Mr. Ferguson specifically asked if Mr. Witt could be present for the polygraph examination.  Mr. Witt testified that he also asked to be present.  Agent Gruzs testified that this request for Mr. Witt to be present came from Mr. Witt and occurred in the public area of the headquarters.  Agent Goble testified that Mr. Witt and Mr. Ferguson came to the polygraph room to meet him and Mr. Ferguson requested that Mr. Witt remain.  Mr. Witt testified that he went to the polygraph room to meet Agent Goble and stated that he would like to stay for the polygraph.  In any case, Mr. Witt was with Mr. Ferguson when the request was made.  Agent Gruzs and Agent Goble denied the requests for Mr. Witt to be present.  They both testified that it was against

4

policy, the room was only large enough for two people, and it would be a distraction to Mr. Ferguson.  Mr. Witt then returned to the public waiting area.

At the beginning of the examination, Agent Goble and Mr. Ferguson were the only two in the room.  Agent Goble told Mr. Ferguson how they would proceed.  (Exhibit B).  He offered Mr. Ferguson the South Dakota Division of Criminal Investigation Polygraph Authorization form.  This form advised Mr. Ferguson that he had the right to refuse to take a polygraph examination, he was free to leave or terminate the examination at any point; he could decline to answer any questions; he had the right to remain silent; he had the right to stop questioning at any time; anything he said could be used against him; he had the right to consult with and have the presence of an attorney; and an attorney would be provided for him if he could not afford one.  Mr. Ferguson stated that he could not read well and asked Agent Goble to read the form to him.  Agent Goble read Mr. Ferguson form at a medium-fast pace.  Agent Goble told Mr. Ferguson to let him know if he needed anything explained.  Mr. Ferguson did not ask any questions.  Mr. Ferguson's signature appears at the bottom of the form.  (Exhibit 3).

Agent Goble also questioned Mr. Ferguson about his medical history.  (Exhibit B).  Mr. Ferguson explained that he was in an accident and suffered a fractured skull.  Agent Goble did not ask follow up questions about the fractured skull.  Mr. Ferguson did not volunteer any effects of the skull fracture.

Approximately 42 minutes into the polygraph examination, Mr. Ferguson answered Mr. Goble's preliminary interview questions about the April 8, 2015 incident.  (Exhibit B).  Mr. Ferguson denied knowledge of a fire, but understood that he was being accused of attempting to start one.  Almost 48 minutes into the interview, Mr. Ferguson denied that the criminal allegations, told Agent Goble he was going to leave, and walked out of the room.  Agent Goble commented to the recording that Mr. Ferguson "walked out at 11:45 a.m."

Agent Gruzs testified that she was waiting nearby and saw the door to the polygraph room was open.  She asked Agent Goble what happened and, when Agent Goble said he didn't know why Mr. Ferguson walked out, she went to find Mr. Ferguson.  Agent Gruzs found Mr. Ferguson in the parking lot with his tribal lay advocate, Mr. Witt.

According to Mr. Witt, Mr. Ferguson came to him and said he did not want to take the polygraph anymore.  According to Agent Gruzs, Mr. Ferguson told her that he had to use the bathroom.  According to Mr. Witt, Agent Gruzs told Mr. Ferguson that in order to prove his innocence, he had to take the polygraph examination.  Mr. Witt told Mr. Ferguson that the polygraph could not be used in court.  After speaking for a few moments, Mr. Ferguson agreed to resume the polygraph examination.

When Mr. Ferguson returned, he told Agent Goble that he "got nervous." Agent Gruzs could be heard in the background saying "and he had to go to the bathroom."  (Exhibit B).  Agent Goble re-advised Mr. Ferguson that he could leave and did not have to answer questions.  Mr. Ferguson opted to stay and

6

continue the examination.  After some practice questions, Agent Goble asked Mr. Ferguson direct questions about the attempted arson.  Mr. Ferguson denied any involvement.

Later, during questioning, Mr. Ferguson requested to go to the bathroom. He left for approximately 5 minutes and then returned.  A few minutes later, Agent Goble decided that he had enough data.  He asked Mr. Ferguson to give him a few minutes to score the examination.

Mr. Ferguson returned to Mr. Witt in the public area.  After approximately 6-7 minutes, Agent Gruzs brought Mr. Ferguson back to discuss his results.  Mr. Witt was not informed there would be a post-polygraph interview and he was not brought back for the post-polygraph interview. During the hearing, Agent Goble testified that he thought it would be a distraction to have someone present while confronting an individual about his deception.  In response from a question from defense counsel, he acknowledged that, in his experience, a licensed attorney would stop the polygraph after the results came back.  Agent Gruzs testified that she did not bring Mr. Witt back because she understood that a lay advocate is not the same as an attorney and she was under no obligation to include him.  She indicated that if Mr. Witt was an attorney and Mr. Ferguson requested he be present, she would have allowed Mr. Witt to be present.  Mr. Witt testified that he would not have allowed Mr. Ferguson to answer the post-polygraph questions.

Agent Goble told Mr. Ferguson that he failed the polygraph examination, which meant that his answers were deceptive.  The following conversation took

7

place shortly after Agent Goble informed Mr. Ferguson the polygraph results indicated his answers were deceptive.

- Goble: Did you in fact drive a dirt bike up there?

- Ferguson: I don't [want to] talk no more.

- Goble: You don't want to talk anymore?  Okay, well that's your right. But, I just wanted to clarify those things.  I mean, if you don't want to talk anymore I'm not going to talk to [you].

- Ferguson: I just . . . I didn't want to hurt nobody either . . . I would never do that with somebody in the house . . .[inaudible] . . . I'll never do that again . . .

- Goble: I just want to make sure we're clear because I want to talk to you . . .  I think you're doing a really good job of explaining it, but when you say you don't want to talk to me more I need to make sure that you're willing to talk to me more.  If you don't want to talk to me more, you can get up and leave.

- Ferguson: I'm trying to do the right thing.

- Goble: Okay.  So are you still wanting to talk to me?

- Ferguson: Yeah.

- Goble: Okay, I just want to make sure because that's your right.  You don't have to . . . .

(Exhibit C).

After the above exchange, Agent Goble continued to question Mr. Ferguson about the fire, how he attempted to set the fire and his motives for the fire. After a few minutes, Agent Gruzs asked Mr. Ferguson how he tried to light the trailer on fire.

- Ferguson: I don't remember . . . how I tried to light the trailer house?

- Gruzs: Yeah.  How did you do it?

8

- Ferguson: I just want to plead the fifth right now.  I don't want to talk about that.

- Goble: Okay.

- Gruzs: Now, there were two fires.  One which was the night before and then the one that those guys saw you.

- Ferguson: I don't know about the one the night before.

- Goble: Okay.  What do you want to talk . . . I mean, because if you don't want to talk about something we're not going to force you to talk about something.  What are you willing to talk to us about?

- Ferguson: [proceeds to talk about how the residents of the trailer affect his cattle and how it seems like they have something against him]

- Goble: Mmhm.  You guys obviously aren't getting along . . . Do you understand generally what you did or attempted to do?  You understand it's wrong?

- Ferguson: (inaudible)

- Goble: Anything else you wanted to tell us about?  I mean, was there, you said you don't know anything else about another . . .

- Ferguson: Are you recording all this right now?

- Goble: Yeah.  The room is recorded.  There's a . . . that's just mine personally.

- Ferguson: I just want to plead the fifth.

- Gruzs: That's fine.

- Goble: We appreciate you coming down here.

(Exhibit C)

Agent Goble asked for Mr. Ferguson's cell phone number.  Agent Gruzs said

she had the number and Mr. Ferguson stated that he didn't want to talk

9

anymore.  Agent Gruzs then told Mr. Ferguson she would take him back to his advocate.  The interview ended at approximately 1:30 p.m.

The defendant filed the pending motion to suppress (Doc. 21) to suppress all statements and the results of the polygraph examination on or about May 15, 2015.

**DISCUSSION**

## I.     Whether law enforcement ran afoul of <u>Miranda</u> Protections

Law enforcement was only obligated to inform Mr. Ferguson of his rights under <u>Miranda</u> if he was interrogated while in custody.  <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) (an individual is entitled to an advisement of <u>Miranda</u> when that individual is "taken into custody for questioning").  <u>Miranda</u> requires that the individual be advised of "his right to be free from compulsory self-incrimination and his right to assistance of counsel."  <u>Id</u>.

### a.  Whether Danny Ferguson was in Custody

Mr. Ferguson argues that at the time of the polygraph examination, he was in law enforcement custody and was not advised of his <u>Miranda</u> rights prior to questioning.  (Doc. 21 at p. 1).  The United States argues that Mr. Ferguson was not in custody.  (Doc. 23 at p. 3).  The United States alternatively argues that if Mr. Ferguson was in custody, he was advised of his <u>Miranda</u> rights prior to beginning the polygraph examination through the authorization form (Doc. 23-1) as well as verbally.

A suspect is in custody when he is "deprived of his freedom of action in any significant manner."  <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th

Cir. 1990).  A court considers the totality of the circumstances in deciding whether "a reasonable person in the suspect's position would have understood his situation to be one of custody." United States v. Anaya, 715 F.Supp.2d 916, 928 (D.S.D. 2010).  The determination of whether a subject is in custody considers both "the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation." United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002).

Griffin lists six non-exhaustive factors that are representative of whether an individual is in custody.  "(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; (6) whether the suspect was placed under arrest at the termination of the questioning." 922 F.2d at 1349.  However, "the most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) (internal quotations omitted) (citing Griffin, 922 F.2d at 1349).

11

Not only was Mr. Ferguson informed that he was free to terminate the interview at will, but almost all of the <u>Griffin</u> factors show that Mr. Ferguson was not in custody. He voluntarily went to the Justice Center to take the polygraph examination. Mr. Ferguson was informed at the time of the polygraph examination that the examination was voluntary. He responded to questions until he decided he no longer wished to. Mr. Ferguson stopped the interview three times and he left the room every time, thereby exercising his freedom of movement. The first time, he left the room and went out to the parking lot. The second time, Mr. Ferguson stated that he had to use the bathroom and left for a few minutes; presumably, to use the bathroom. The third time, he stopped the post-polygraph interview after he learned his responses were being recorded and walked out of the room.

No deceptive stratagems to speak of were employed. Before beginning the post-polygraph portion of the interview, Agent Goble told Mr. Ferguson that the results of the polygraph indicated he was being deceptive. "It was not improper to inform [Ferguson] that [his] polygraph test results indicated deception." <u>Jenner v. Smith</u>, 982 F.2d 329, 334 (8th Cir. 1993) (citations omitted). Though Agent Gruzs was deceptive when, in the parking lot, she told Mr. Ferguson that taking the polygraph was the only way to show his innocence, this comment came in the presence of Mr. Witt and also did not prevent Mr. Ferguson from freely returning to and leaving from the polygraph examination two more times.

12

Furthermore, the atmosphere was not police dominated.  Mr. Ferguson was interrogated in BIA offices, but when he made his incriminating statements, he was only with one or two agents.  Those agents had both made it clear on separate occasions that Mr. Ferguson did not have to speak with them.  While the room was approximately eight feet by ten feet, the door was unlocked and Mr. Ferguson used it multiple times.  Mr. Ferguson was also not placed under arrest at the termination of the examination.

Mr. Ferguson was not in custody.  His freedom of movement was not restrained in any significant manner and a reasonable person would not understand his situation to be one of custody.  Because the court concludes that Mr. Ferguson was not in custody, it is unnecessary to decide the sufficiency of the written warning in the polygraph consent form or in Agent Goble's verbal admonishment.

### b. Whether Mr. Ferguson was Entitled to the Presence of Counsel in a Non-custodial Interrogation

As a result of this lack of custody, the United States argues that Mr. Ferguson was not entitled to counsel.  (Doc. 41 at p. 6-7).  The Eighth Circuit has held that a defendant's Fifth Amendment rights are not implicated if the defendant is not in custody.  United States v. Muhlenbruch, 634 F.3d 987, 997 (8th Cir. 2011); United States v. Fitterer, 710 F.2d 1328, 1333 (8th Cir.1983) ("[Defendant] was not in custody ... and therefore the [F]ifth [A]mendment right to counsel is not implicated.").

This also raises the question of whether Mr. Witt can be considered counsel for the purposes of <u>Miranda</u> because he did not attend law school, is not licensed to practice in any state and is not admitted to practice in any state or federal court in the United States.  This, plus the clear law that lay counsel does not qualify as counsel under the Sixth Amendment, is what the United States relies on for its conclusion that Mr. Witt is not counsel for the purposes of <u>Miranda</u>.  (Doc. 41 at p. 8-12).  Mr. Ferguson argues that Mr. Witt does qualify as counsel under <u>Miranda</u> because he is licensed to practice in Oglala Sioux Tribal Courts and regularly represents defendants in criminal matters on the Pine Ridge Indian Reservation.  (Doc. 42 at p. 3-4).

The <u>Miranda</u> Fifth Amendment right to counsel has different goals than the Sixth Amendment right to counsel.  The presence of counsel during custodial interrogation is to protect suspects against the inherent compulsion present in custodial interrogations to ensure statements are the product of free choice.  <u>Miranda</u>, 384 U.S. at 458.  The Sixth Amendment right attaches after "formal charge, preliminary hearing, indictment, information or arraignment." <u>United States v. Bird</u>, 287 F.3d 709, 713 (8th Cir. 2002) (quotations omitted) (other citations omitted).  The time between indictment and trial, "the period of thorough-going investigation and preparation, is perhaps the most critical period of the proceedings and a defendant is as much entitled to counsel's aid during that period as the trial itself."  <u>Id.</u> (internal quotations omitted) (other citations omitted).  The suspect has become the accused (<u>Id.</u> at 714) and is

14

entitled to representation by an advocate who is a member of the bar.  See
Wheat v. United States, 486 U.S. 153, 159 (1988) (other citations omitted).

While still an undecided issue in this circuit, a lay advocate could
potentially be considered counsel "sufficient to trigger [F]ifth [A]mendment
rights." United States v. Killeaney, No. 07-30063-01-KES, 2007 WL 4459348,
*8, n. 3 (D.S.D. Dec. 17, 2007) (citing United States v. Eastman, 256 F.Supp.2d
1012 (D.S.D. 2003) (remained unresolved because the defendant did not clearly
request a lawyer)).

Important to the court's decision in this case is the recognition that when
a defendant is not in custody "he is in control, and need only shut his door or
walk away to avoid police badgering."  Montejo v. Louisiana, 556 U.S. 778
(2009).  Walking away is exactly what Mr. Ferguson did here.

Regardless of whether Mr. Ferguson is entitled to counsel in a non-
custodial setting and regardless of whether Mr. Witt can be considered counsel
within the meaning of Miranda, Mr. Ferguson was with Mr. Witt when the
police told both of them that Mr. Witt could not be present for the questioning.
The testimony presented indicates that Mr. Witt, not Mr. Ferguson, requested
that Mr. Witt accompany Mr. Ferguson during the polygraph interview. Agent
Gruzs informed them that Mr. Witt was not going to be permitted to be present
during the polygraph interview.  At that time, Mr. Ferguson had the support of
Mr. Witt, as his desired lay counsel, to refuse to take the polygraph
examination.  In the attendance of Mr. Witt and upon learning that Mr. Witt
could not be present, they made the decision to allow Mr. Ferguson to go it

15

alone.  There was no evidence that Mr. Ferguson ever requested counsel *after* this pre-interview discussion.  There was also no testimony that Mr. Ferguson requested Mr. Witt's presence for any post-polygraph interview.  See United States v. Jacobs, 97 F.3d 275, 280 (8th Cir. 1996) (the defendant requested a lawyer for the limited purpose of taking the polygraph test, so his request was "limited to the specific circumstance of taking a polygraph test").

Mr. Ferguson proceeded to speak with Agent Goble and exercise his other rights, such as the right to remain silent or terminate questioning at any time.  Mr. Ferguson had no reason to believe that the agents would disregard his requests to remain silent or terminate questioning, as Agent Goble and Agent Gruzs previously recognized and respected these requests.

Mr. Ferguson never requested counsel after his interview began.  In fact, when Mr. Ferguson left the polygraph examination room and met with Mr. Witt in the parking lot, the request that Mr. Witt be present was not renewed nor did Mr. Witt advise Mr. Ferguson to cease the polygraph examination.  Thus, it is unnecessary to resolve whether Mr. Ferguson would have been entitled to his lay advocate in a non-custodial situation.

### c. Whether the Agents Honored Danny Ferguson's Desire to Remain Silent

Mr. Ferguson invoked his right to remain silent during the interview, so this court will consider whether the agents honored this invocation of his right. For the most part, the parties are in agreement that Mr. Ferguson was being interrogated.  However, the parties disagree on this point during the post-polygraph interview.  Mr. Ferguson argues that he was being interrogated by

Agent Gruzs and Agent Goble even after he asserted his right to remain silent. (Doc. 21 at p. 1). The government argues that it was Mr. Ferguson who reinitiated questioning, despite his stated desire to remain silent. (Doc. 23 at p. 5).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980); ; see also United States v. Head, 407 F.3d 925, 925 (8th Cir. 2005) ("Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect."). The "words or actions" of the police must be outside the scope of words and actions that normally accompany the arrest and taking into custody of a defendant. United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (citing Innis, 446 U.S. at 301). "A statement made by a suspect that is voluntary and not in response to interrogation is admissible with or without the giving of Miranda warnings." Head, 407 F.3d at 925. "Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005).

"[A] suspect's right to cut off questioning is grounded in the Fifth Amendment and must be scrupulously honored," (Reynolds, 743 F.Supp.2d at 1090 (citing Michigan v. Mosley, 423 U.S. 96, 103-04 (1975) (internal citations omitted)) law enforcement must cease questioning if the invocation of Miranda

17

rights is "clear and unequivocal." <u>Reynolds</u>, 743 F.Supp.2d at 1090 (citing <u>Davis v. United States</u>, 512 U.S. 452, 459-60 (1994)).

The agents "scrupulously honored" Mr. Ferguson's desire to remain silent. After Mr. Ferguson stated that he did not want to talk anymore, Agent Goble told Mr. Ferguson that it was his right not to talk anymore. This statement was not likely to elicit an incriminating response. Mr. Ferguson then made statements, which Agent Goble met with an advisement that Mr. Ferguson did not have to talk and could leave. Mr. Ferguson responded in the affirmative when he was asked whether he wanted to continue talking.

A few minutes later, Agent Gruzs posed Mr. Ferguson a question regarding how the trailer was set on fire. Mr. Ferguson responded that he did not want to discuss that topic stating, "I don't want to talk about that." Agent Gruzs posed a question relating to a different topic. Mr. Ferguson continued to make voluntary statements. After discovering his statements were recorded, Mr. Ferguson made it known that he did not want to talk about anything else and the agents ended questioning.

Mr. Ferguson was being interrogated by the agents, but the agents stopped questioning when Mr. Ferguson clearly and unequivocally invoked his right to remain silent. Therefore, the agents honored Mr. Ferguson's right to remain silent.

## II.  **Whether Danny Ferguson's Statements Were Made Voluntarily**

Mr. Ferguson argues that the examination was coercive and his statements were involuntary. (Doc. 21 at p. 2). He also argues that he

previously sustained a head injury.  (Id.)  The United States argues that the examination was not more coercive than the level usually found in interrogations and Ferguson gave his statements voluntarily.  (Doc. 23 at p. 6-7).

"Due process requires that confessions be voluntary."  United States v. Anaya, 715 F.Supp.2d 916, 931 (8th Cir. 2010) (citing Brown v. Mississippi, 297 U.S. 278, 285-86 (1936)).  "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired."  United States v. Astello, 241 F.3d at 965, 967 (8th Cir. 2001) (citing United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995)).  "A statement is voluntary if it is the product of an essentially free and unconstrained choice by its maker."  Anaya, 715 F.Supp.2d at 931 (8th Cir. 2010) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

The voluntariness of a confession is judged by the totality of the circumstances.  Anaya, 715 F.Supp.2d at 932.  The "conduct of the officers and the characteristics of the accused" are both considered in this determination Id.  It is important to note that "[a] statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity."  Id. (citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986)).  The government bears the burden to prove by a preponderance of the evidence that the statements were voluntary.  Anaya, 715 F.Supp.2d at 932.

Factors the court may weight to determine whether a defendant gave a voluntary statement include "the prolonged nature of the questioning . . . the defendant's subjective understanding of his <u>Miranda</u> rights . . . the age of the defendant . . . his lack of education, or his low intelligence . . . the defendant's prior contact with law enforcement . . . and the use of physical punishment such as deprivation of food or sleep." <u>United States v. Reynolds</u>, 743 F.Supp.2d 1087, 1091 (8th Cir. 2010) (internal citations omitted).

Mr. Ferguson is 39 years old.  He graduated from high school.  He has some criminal history, but the details of his interactions with law enforcement before the April 29 interview and the May 15 polygraph examination are unclear.  The court finds the April 29 interaction with Agents Gruzs and Lucas significant in that Mr. Ferguson had no trouble telling the agents that he was finished answering their questions and asked them to leave his home at that time.  Similarly, on the day of the polygraph, Mr. Ferguson had no trouble exercising his right to terminate questioning multiple times.

Additionally, if Mr. Ferguson suffered any mental impairment, there is no evidence to suggest that Agent Goble knew about the impairment or exploited such impairment.  Agent Goble discovered that Mr. Ferguson had suffered a head injury when he was 25 years old.  (Exhibit B).  He did not discover, and Mr. Ferguson did not volunteer, any information that would suggest to Agent Goble that he had persisting mental impairments as a result of the accident.  Thus, Mr. Ferguson's statements on the day of the polygraph examination were voluntary.

### III.     Whether Danny Ferguson's Polygraph Examination is Inadmissible

Mr. Ferguson argues that his polygraph examination is inadmissible.  A request to "suppress" evidence relating to the polygraph test itself and the results "is really a motion in limine." United States v. Dupris, 422 F.Supp.2d 1061, 1072 (D.S.D. 2006) (the court could rule on the voluntariness of statements made and whether the statements should or should not be suppressed, but the admissibility of testimony concerning the fact that a polygraph was administered and opinions concerning defendant's performance was really a motion in limine).

As this is a motion to suppress, the court will only rule on the motion before it.  Any request to have the polygraph results and opinions concerning defendant's performance should be addressed in a motion in limine.

### CONCLUSION

It is respectfully recommended that Danny Ferguson's motion to suppress be denied in its entirety.

### NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 1st day of June, 2016.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge